GALLOWAY v. MICHIGAN SAVINGS & LOAN ASS'N.

(Circuit Court of Appeals, Sixth Circuit.    July 22, 1913.)

No. 2,352.

1. BUILDING AND LOAN ASSOCIATIONS (§ 42*) — INSOLVENCY — CLAIMS — EVIDENCE.

In an action to settle the affairs of an insolvent building and loan association, evidence *held* to require a finding that claimant, who had loaned money to the secretary of the association as an individual, but in fact for the association, which received the benefit of the loan and issued to the secretary a certificate therefor, which he assigned to claimant, was entitled to prove his claim for the amount of the certificate and receive dividends thereon.

[Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 63, 66, 86–88;  Dec. Dig. § 42.*]

2. EQUITY (§ 23*)—INCONSISTENT PORTIONS.

A court of equity will not refuse to enforce a contract merely because complainant had contracted for an additional, somewhat inconsistent, status, which additional status he is in the same case prevented from enforcing.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 63–68;  Dec. Dig. § 23.*]

Appeal from the District Court of the United States for the Eastern District of Michigan;  Alexis C. Angell, Judge.

Proceedings for the settlement of the affairs of the Michigan Savings & Loan Association through a receiver.    From an order denying the claim of James S. Galloway, he appeals.    Reversed and remanded.

The Michigan Savings & Loan Association. being insolvent, was put into the hands of a receiver, by the court below, in 1901.    The various phases of the existing and resulting situations have been before this court in Aldrich v. Gray, 147 Fed. 453, 77 C. C. A. 597, 8 Ann. Cas. 832. Standard Co. v. Aldrich, 163 Fed. 216, 89 C. C. A. 646, 20 L. R. A. (N. S.) 393, and Amberg v. Aldrich, 205 Fed. 498, decided May 6, 1913.    After the order was made for the proving of claims, the appellant herein, Mr. Galloway, filed his claim as the holder of certificate No. 8,198 for 228 shares of prepaid stock in the Association. The certificate appeared to have been issued January 3, 1899, to Fred B. Wemple (then the secretary and general manager of the Association), and to have been by him transferred to Galloway.    It purported also to stand for and represent a cash payment of $15,000 to the Association, and to entitle the holder, at the maturity of the certificate, to receive $22,500.    It also entitled the holder, on conditions not now important, to withdraw the original investment:  and it is conceded that, if no sufficient reason intervenes, Galloway was entitled, as holder of this certificate, to have his claim allowed as a quasi creditor, at $15,000, and to receive whatever dividend might ensue. The claim was allowed without objection, and so remained for several years. The receiver then procured the matter to be reopened, the claim was eventually disallowed, and Galloway appeals.

The receiver's position, sustained by the court below, was that the company received no consideration for the certificate, that the same was issued to Wemple without authority, and that Galloway was not a good-faith purchaser.    Except as hereinafter noted, there is little dispute about the facts. Wemple approached Galloway and endeavored to sell him stock of the Association.    Galloway refused.    He then held the Association's note for $25,-000, which he had loaned to it.    Wemple then stated that there was real estate in Galveston, Tex., which had been taken over by the Association on

foreclosure and really belonged to the Association, but the title to which stood in Wemple's name, and that it was desired to borrow $15,000 on the security of this real estate; and he proposed that, if Galloway would loan this sum, he (Wemple) would execute his personal note and deed of trust for the lands, and also would take the money and with it buy from the Association a prepaid $15,000 certificate and turn this over to Galloway as additional security. Galloway investigated the real estate security (which was then ample, and apparently would so have remained, except for the great storm of 1900, which utterly destroyed the property), accepted the proposition, and received the note, deed of trust, and the certificate in question. Galloway paid the money in the manner hereafter stated. When his claim was reopened for contest, he undertook to make the additional claim that the loan, although in form to Wemple, was really for the use and benefit of the Association, and that he was entitled to its allowance as an ordinary creditor, and not as a mere certificate holder, and so was entitled to receive payment in full before certificate holders received anything.

F. A. Lyon, of Hillsdale, Mich., for appellant.

M. B. Whittlesey, of Detroit, Mich., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Appellant's argument in this court is largely devoted to maintaining the position just stated, viz., that the loan was for the use and benefit of the Association, entitling him to the position of an ordinary creditor. We think he cannot be heard to claim this result. Upon the claims hearing before the master, the receiver objected that this position was inconsistent with Galloway's original claim, and on motion of the receiver the master required Galloway to strike out all his testimony and pleadings based on this aspect of the matter and to confine himself to his claim as a certificate holder. On the hearing of exceptions before the District Court, this order of the master was affirmed. When, later, Galloway came to appeal from the final decree, he did not make any assignment of error which, fairly considered, indicated that he intended to reserve or rely upon this objection. It is too late to do so for the first time by brief and argument in this court.

[1] Both the master and the District Court found, as a fact, that the company did not receive any consideration for this certificate. Such a concurrent finding will be reversed by this court only in the plainest case. Haines v. Bank (C. C. A. 6) 203 Fed. 225. We are satisfied, however, that it grew out of a misapprehension, rather than out of a balancing of conflicting evidence. The former manager, Wemple, testifying regarding a list of certificates before him, and coming to this certificate, said: "Nothing paid in on this certificate." The record suggests that the attention of the court below was not directed to any other evidence, and that the counsel then acting for Galloway relied mainly upon the claim that Galloway was entitled to recover as a good-faith holder, even if this testimony by Wemple was accepted as the fact. The original books and records of the Association, which had been offered in evidence, but were not included in the printed record, have been furnished to us at our suggestion, and we have examined them at length as bearing on this point. We think it clear that

Wemple's statement, "Nothing paid in on this certificate," was either an inadvertence on his part or a stenographer's mistake. The witness was giving, as concerned each certificate in the list before him, the dates and the amounts when withdrawal payments had been made. The other certificates had been withdrawn or paid off—some of them in whole and some of them in part—and it seems probable that what he intended to say or did say was "nothing paid on this certificate," meaning "nothing paid off" or "nothing withdrawn." However this may be, the fact is perfectly clear, and it is established beyond doubt, that the Association did receive and have the benefit of the entire $15,000.

Galloway testifies that, although the arrangement was not completed until early in January, 1899, yet the negotiations had been pending for some time, and about November 30, 1898, in anticipation of this loan, he furnished the Association $3,250, taking the Association note therefor, and that, when the loan was closed, about December 30, 1898, this note was considered as an advance on the loan. He says the Association owed him about $500 of interest on a prior loan, which interest debt was merged in the $3,250 loan, so that his cash advance, on November 30th, was about $2,700; but he is not able to produce check, draft, or other evidence of payment. The cash book of the Association shows that on December 1, 1898, it received cash from Galloway $3,250, and paid him for interest and discount $480, leaving $2,770 as its net cash receipt from him; and it further shows that part of this money served to make up an existing overdraft, and the surplus was checked out, apparently in the ordinary course of business, on that day and the next.

On January 4, 1891, a letter was written to Galloway as follows:

"Michigan Savings & Loan Association,
"January 4, 1899.

"Mr. James S. Galloway, Hillsdale, Mich.

"Dear Sir: I sent all papers to Galveston, and they will no doubt reach you the first of next week. We have some $8,000 or $10,000 to pay the first of the week, and if you feel disposed to advance us $3,500 upon this loan, it will be quite an accommodation. We inclose note for $15,000, and certificate of stock, which are assigned as collateral. Balance of the papers will reach you in due time. There will be no question but what the title will be clear.

"Yours truly,                    The Mich. Sav. & Loan Assn.
                                    "F. B. Wemple, Sec'y."

Mr. Galloway testified that he then had on hand a certificate of deposit for $3,551.89, which he forwarded in response to this request, and the canceled certificate is produced. It was payable to the order of J. S. Galloway, was by him indorsed to "F. B. Wemple, Sec'y," and further indorsed to the collecting bank by "The Michigan Savings & Loan Association, by F. B. Wemple, Sec'y." The Association's cash book shows that it received this exact amount from Mr. Galloway on January 9th, and that this money served, as far as it would go, to provide funds to meet checks drawn by the Association on that day, some of which were apparently to pay bank loans and others to pay certificate withdrawals. The receipt of this money was acknowledged

by the Association in a letter to Mr. Galloway, dated January 6th. This letter further stated that the title to the Galveston property was being put in perfect shape and the papers would soon be received.

As to the next payment, Galloway testifies that on January 21st, it having developed that there were about $4,000 of back taxes against the Galveston property, and acting at Wemple's request, he sent a draft for $4,000 to attorneys in Galveston to be used to clear up taxes, and the draft is produced payable ·to, and bearing the indorsement of, these attorneys, and paid through a Galveston bank. The cash book of the Association, under date of December 30, 1898 (though following entries of January 18, 1899), gives credit to Mr. Galloway for $4,000 as cash received, and charges this amount with other items, to an account which is sometimes called "Galveston Account," and sometimes called "R. J. Wilson, Agent."

Galloway says that at the time of sending this draft to Galveston he made a further advance of $3,098.11, composed of a New York draft for $2,159.69, and his own check or a local certificate for $938.42. The check or certificate he is unable to find, but the draft he produces. It is payable to his order, indorsed over by him to the Michigan Savings & Loan Association, and indorsed by the Association to the collecting bank. The Association cash book, under date of January 23, gives Galloway credit for this sum of $3,098.11 as cash received, and indicates its immediate use to help out an overdraft and meet current disbursements.

The sums so far given amount to $14,000. Galloway explains that he withheld $1,000 because the title was not entirely perfected, but gave his duebill for that sum, which duebill is produced and reads as follows:

"Hillsdale, Mich., January 21, 1899.

"Due Michigan Savings & Loan Association one thousand dollars, on return of abstracts of title of lands in Galveston, Texas, completed; all loans discharged, trust deed recorded, and insurance policies delivered to me on said property.                                                     J. S. Galloway."

He says this duebill was paid by later applying it against interest due him from the Association on a prior loan and upon this loan, and he produces a letter, dated June 23, 1899, signed "F. B. Wemple, Sec'y," stating this adjustment. The Association cash book, under date of June 30th, credits Galloway with items amounting to $1,000 and charges them to the interest account ("coupons"). The details of the adjustment partially differ, as stated by Galloway, by the Wemple letter, and by the cash book, but the substantial result is the same under all three methods.

The ledger and cash book contain other entries, some of which are not intelligible without explanation, indicating that Wemple, or whoever kept the books, at the close of 1900, transferred into Wemple's account the credit of $15,000 which had thus been given to Galloway, and the certificate register shows that at some time and by some one this certificate was (falsely) marked "Canceled"; but these things (without proof of Galloway's knowledge or consent) do not detract from the force of the proof that the Association did in fact receive

and have the benefit of the entire $15,000 said to be represented by the certificate in question. Galloway not only would naturally rely upon Wemple's statement that the amount of money which this certificate purported to represent was or would be paid into the Association treasury, but the statement was true.

It is further urged that the judgment is right, because Galloway deliberately elected to make his loan to Wemple and take Wemple's personal liability, and that the same money cannot be considered as money loaned to Wemple to support his note and mortgage and as money paid to the Association to support its paid-up certificate. We see no inconsistency in these positions, when related to each other as they are in this record. We do not find serious challenge, if any, of the truth of Wemple's story, as told to Galloway, that the title to this Galveston property was held by Wemple for the Association, and that the fund would really be for its use and benefit. In view of his large existing loan to the Association and its lack of power to borrow money for some of the purposes for which it was in fact using what it did borrow (Standard Co. v. Aldrich, supra), it was not unnatural or imprudent for Galloway to refuse to loan to the company and to take obligation and security directly from Wemple. In view of Wemple's trust relation to the Association, and his existing power of management, it was not unnatural for him to be willing to give his personal note for the benefit of the Association. Under these circumstances, Galloway and Wemple had a perfect right to agree, as they did, that the $15,000 should be loaned by Galloway to Wemple, that Wemple should take the money and invest it in a paid-up Association certificate, and should turn over the certificate to Galloway as an additional, collateral security. This is the form and the primary effect of what was done. The fact that the loan was advanced in installments, some of them postponed until after the certificate was actually issued, cannot be material as between Galloway and the Association, when we remember that all the remainder of the price of this certificate was shortly afterwards paid into the Association treasury. The premature delivery of the certificate did not, in the slightest, prejudice the Association; and no question is made, and apparently no question could be made, as to Wemple's full authority to issue and deliver the certificate if and when he received for the Association the full price thereof.

[2] The claim that Galloway's money is made to serve two inconsistent purposes is met by what has been said, if the transaction is viewed in the form which the parties selected, viz., a loan to Wemple and a paid-up certificate issued to him. The proof that Wemple did in fact account for or pay over to his beneficiary the money that he borrowed on the security of property which equitably belonged to his beneficiary removes any question that might otherwise exist as to the rightfulness of the loan by Galloway to Wemple upon the security of property which, to Galloway's knowledge, really belonged to the Association. If, however, the transaction should be viewed by a court of equity according to its ultimate substance (as between Wemple and the Association) and as a loan from Galloway to the Association in which Wemple

was a mere convenience or in which his personal liability was additional and secondary, is there, then, any inconsistency in permitting Galloway to enforce this certificate? We may well assume, for the purposes of this question, that Galloway, if he had been dealing directly with the Association, could not, at the same time and for the same money, become a general creditor and a certificate holder, so that he would be entitled to pursue and enforce both positions; but it does not follow that he cannot enforce either. Upon the hypothesis we are now considering, Galloway could have contracted with the Association to become, in exchange for his $15,000, either a general creditor or a certificate holder. Let us assume that he undertook to get himself into both positions; but in this very proceeding now here pending he has been refused permission to sue as a general creditor, and we hold him bound by this refusal. We are not aware of any principle by which a court of equity may deny to Galloway the right to rely upon his certificate contract merely because he may have contracted for an additional, somewhat inconsistent, status, which other status he has not enforced, and has been, by the same court, in the same proceeding, prevented from enforcing.

The order appealed from must be reversed, with directions to enter an order recognizing Galloway's right as the holder of this certificate and entitled to receive any dividends properly applicable thereto. Galloway will recover the costs of this appeal and the costs in the court below apportionable to this proceeding.